UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHRISTINE BEAUSOLEIL and JUDITH SCHOLL, | |
| Plaintiffs, | Case No. 18-13139 Honorable Laurie J. Michelson |
| v. | |
| RICK SNYDER, HEIDI WASHINGTON, KENNETH MCKEE, BRUCE CURTIS, STEVE RIVARD, LLOYD RAPELJE, ANTHONY STEWART, SHAWN BREWER, TONI MOORE, and NORMAN LAUGHLIN, | |
| Defendants. | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [57]

This case involves upsetting facts. Christine Beausoleil and Judith Scholl were sentenced to relatively short prison terms and yet, during their stay at the Women's Huron Valley Correctional Facility (WHV), they were repeatedly sexually assaulted by a staff person there, Norman Laughlin.

This case also involves the challenging task of deciding who, aside from Laughlin, is responsible for the abuse. The abuse occurred in a warehouse at WHV, and Plaintiffs Beausoleil and Scholl have sued Toni Moore who supervised warehouse operations at WHV. They have also sued the two WHV Wardens during their sentences, Anthony Stewart and Shawn Brewer. In addition, Plaintiffs have sued higher-level people in the Michigan Department of Corrections,

including the MDOC's Director, Heidi Washington. In Beausoleil's and Scholl's view, all of these people were deliberately indifferent to Laughlin's abuse, and thus violated their rights under the Eighth Amendment. Given that assertion, this case involves determining what each defendant knew about Laughlin's proclivities, and when they knew about it.

All of the defendants—except Laughlin—seek summary judgment. (Laughlin has failed to answer the complaint and is in default.) The summary-judgment record partly supports and partly fails to support Beausoleil's and Scholl's claims. As will be explained, a reasonable jury could find that Moore, Stewart, and Brewer were deliberately indifferent to a substantial risk that Laughlin was sexually abusing female prisoners at WHV. But no reasonable jury could find the same to be true of higher-level MDOC officials who did not work at WHV. Defendants' motion for summary judgment will thus be granted in part and denied in part.

## I.

### A.

Some information about the Women's Huron Valley facility itself, WHV's policies against sexual misconduct, and the history of staff sexual abuse within the Michigan Department of Corrections provides a backdrop for this case.

In the mid-1990s, "Tracey Neal and five other female prisoners filed a class action lawsuit against the Michigan Department of Corrections . . . and individual officials . . . . alleg[ing] a pattern of systematic sexual misconduct, sexual harassment and abuse by the MDOC." Margo Schlanger, *Case Profile: Neal v. Michigan Department of Corrections*, Civil Rights Litigation Clearinghouse, https://perma.cc/NMT2-VFCV. With multiple appeals, the case extended into the 2000s. *Id.* In 2009, the MDOC agreed to pay $100 million to settle the *Neal* case and three other cases. *Id.* While the litigation was pending, the MDOC "made significant changes in the staffing

of the housing units in female correctional facilities to specifically address and reduce sexual assaults and sexual harassment by male staff toward female prisoners." Class Settlement Agreement, *Neal v. Mich. Dep't of Corr.*, No. 96-6986 (Mich. 22d Cir. Ct. July 15, 2009).

Since 2009, all female prisoners in the custody of the Michigan Department of Corrections have resided at a single correctional facility: the Women's Huron Valley Correctional Facility. Currently, WHV has about 2,000 prisoners and 580 staff. (ECF No. 61-24, PageID.895.) About three quarters of the staff are female. (ECF No. 61-24, PageID.899.)

While other MDOC facilities have around 100 to 200 security cameras, WHV has many times more, "well over" 1,400. (ECF No. 61-31, PageID.1246; *see also* ECF No. 61-32, PageID.1280 (estimating 1,700 cameras).) These cameras are continuously monitored by two people in a control center. (ECF No. 61-31, PageID.1252.) But the control center only has 15 screens; so only a small fraction of the cameras can be monitored at any given moment. (*See* ECF No. 61-31, PageID.1252.) Aside from the control center, other WHV staff, including the warden and the business manager, had monitors at their workstations for viewing the cameras. (ECF No. 61-31, PageID.1262; ECF No. 61-31, PageID.1251.) In addition to a live feed from the cameras, the warden and others could review past footage. (ECF No. 61-31, PageID.1252.)

At least by 2011, WHV began operating a warehouse. (ECF No. 61, PageID.702.) Personal items, which prisoners could order, would be delivered to the warehouse. (*See* ECF No. 61-24, PageID.911–912.) The warehouse "storekeeper," along with prisoners under his supervision, were responsible for sorting the delivered products and then bringing them to the prisoners in the housing units. (*See* ECF No. 61-29, PageID.1154; ECF No. 61-26, PageID.1015.) At WHV, this was known as delivering a prisoner's "store." (*See* ECF No. 61-28, PageID.1108; ECF No. 61-29, PageID.1154, 1160.)

Despite the many cameras at WHV, the warehouse had no cameras until July 2016. At that time, four cameras were installed. (ECF No. 61-32, PageID.1281, 1284; ECF No. 61-30, PageID.1206.) But even with four cameras in the warehouse, there were areas outside of the cameras' view. (ECF No. 61-30, PageID.1214; ECF No. 61-32, PageID.1286.)

WHV staff were required to follow an operating procedure for "allegations of gender-based misconduct between prisoners and staff." (ECF No. 61-4, PageID.801.) (The Court inquired, and counsel confirmed that the 2013 operating procedure was still in effect at the time Beausoleil and Scholl were at WHV.) The operating procedure defined gender-based misconduct to include "overfamiliarity," "staff sexual harassment," and "staff sexual misconduct." (ECF No. 61-4, PageID.801.) In turn, overfamiliarity included "[c]onduct between an employee and a prisoner which has or is likely to result in intimacy or a close personal association." (ECF No. 61-4, PageID.801.) Staff sexual harassment included "verbal statements or comments of a sexual nature directed by staff to a prisoner." (ECF No. 61-4, PageID.802.) And staff sexual misconduct included "intentional touching, either directly or through clothing, of a prisoner's genitals, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, arouse, or gratify the sexual desire of any person." (ECF No. 61-4, PageID.802.)

In addition to defining overfamiliarity, sexual harassment, and sexual misconduct, the WHV operating procedure also provided that certain rule violations amounted to gender-based misconduct. Two are worth mentioning here: a "knock and announce violation" and a "one on one violation." (ECF No. 61-4, PageID.802.) The knock-and-announce rule required male staff at WHV to, absent compelling circumstances, "verbally announce their presence prior to entering an area of the facility where prisoners could be in a state of undress." (ECF No. 61-4, PageID.802.)

The one-on-one rule restricted male staff "from being alone with female prisoners in one-on-one situations in areas of the facility that are not clearly visible to other prisoners or staff." (*Id.*)

In addition to defining gender-based misconduct, the WHV operating procedure described how allegations of staff gender-based misconduct would be investigated. There were numerous ways for a prisoner to report sexual misconduct by staff, including a hotline, a standard grievance, a Prison Rape Elimination Act grievance, and simply speaking with any MDOC staff. *See* MDOC Policy Directive 03.03.140, ¶ W (eff. Feb. 8, 2015); MDOC Policy Directive 03.03.140, ¶ Y (eff. Apr. 24, 2017). But one reporting method is particularly relevant to this case: a report via a "kite."

A "kite" is prison parlance for a letter that a prisoner sends to "a staff person, area, or department" within the prison. (ECF No. 61-24, PageID.923.) Prisoners drop these letters in collection boxes, and confidentiality is not ensured. (ECF No. 61-26, PageID.1017–1019; ECF No. 61-29, PageID.1153, 1177; ECF No. 61-31, PageID.1255.) Indeed, sometimes staff direct prisoners to respond to kites sent by other prisoners. (ECF No. 61-29, PageID.1153.) Various prison officials, including wardens, deputy wardens, and the business office, received numerous kites each day. (ECF No. 61-24, PageID.923; ECF No. 61-26, PageID.1019; ECF No. 61-27, PageID.1067.) For instance, a deputy warden at WHV recalled getting 20 or 30 kites a day. (ECF No. 61-27, PageID.1067; *see also* ECF No. 61-26, PageID.1019 (noting that "business office" would receive 50 kites daily or weekly); ECF No. 61-24, PageID.923 (noting that a warden would receive "20 a day or more").)

The WHV operating procedure provided that if a staff person received a kite alleging that another staff person engaged in gender-based misconduct, he or she was to notify his or her supervisor or the on-duty shift commander (or both) "immediately." (ECF No. 61-4, PageID.803.) The supervisor or on-duty shift commander then had to determine what actions were necessary to

protect the prisoner and make a written report to the deputy warden by the end of his or her shift. (ECF No. 61-4, PageID.804.) The deputy warden was then responsible for reviewing that report, obtaining a statement from the prisoner, and making a recommendation about the accused staff person to the warden. (*Id.*) The deputy warden had to submit the shift commander's written report, the statements from the prisoner, and his recommendation to the warden. (*Id.*) The warden was then responsible for assigning staff to investigate the allegations. (*Id.* at PageID.803.)

## B.

At this point in the factual narrative, it is helpful to introduce the people who were involved or, at least, were alleged to be involved in the events giving rise to this case.

Plaintiff Christine Beausoleil was a prisoner at WHV and worked in the WHV warehouse from April 2016 to May 2017. (ECF No. 57-4, PageID.655.)

Plaintiff Judith Scholl was a prisoner at WHV and worked in the WHV warehouse from January 2017 to March 2019. (ECF No. 61-29, PageID.1154, 1156.)

Defendant Norman Laughlin began working for the MDOC in 2000 and worked at WHV from 2009 to January 2018. (ECF No. 57-14, PageID.653; ECF No. 61, PageID.702.) Laughlin held the position of "storekeeper" and worked in the WHV warehouse. (ECF No. 61-26, PageID.1000, 1015.) As a storekeeper, Laughlin supervised Beausoleil and Scholl. (ECF No. 57-14, PageID.655; ECF No. 61-26, PageID.1016.)

Timothy Howard was the Storekeeper Supervisor and thus, Laughlin's supervisor. (ECF No. 61-26, PageID.1015.) Howard was suspended in 2017 and, after an investigation, terminated in 2018, for having a sexual relationship with a WHV parolee who had worked in the warehouse. (ECF No. 61-9, PageID.825; ECF No. 61-29, PageID.1170.) While at WHV, Howard reported to

the Assistant Business Manager or Business Manager at WHV. (ECF No. 61-26, PageID.999, 1026.) Howard is not a defendant in this case.

At times relevant to this case, the Business Manager at WHV was Defendant Toni Moore. (ECF No. 61-26, PageID.995.) Moore was responsible for WHV's budget, approving purchases, and completing financial reports. (ECF No. 61-26, PageID.995.) Moore was a supervisor for several operations at WHV, including the warehouse operations. (ECF No. 61-26, PageID.995.) In her role, Moore was responsible for ensuring that the warehouse was "in compliance with policy and procedure." (ECF No. 61-26, PageID.995.) Moore's office was located "right next" to the warehouse (ECF No. 61-26, PageID.997), and she would go in and out of the warehouse frequently, up to "five or six times a day" (ECF No. 61-26, PageID.1001). Moore reported directly to the WHV Warden. (ECF No. 61-26, PageID.995.)

At the time Beausoleil and Scholl were at WHV, David Johnson was the Deputy Warden of Custody and Security. (ECF No. 61-31, PageID.1244; ECF No. 61-26, PageID.1004.) Johnson is not a defendant in this case.

While Beausoleil and Scholl were at WHV, the wardens were Defendant Anthony Stewart and, starting in July 2017, Defendant Shawn Brewer. (ECF No. 61-31, PageID.1241; ECF No. 61-24, PageID.894.) As wardens, Stewart and Brewer had a host of people reporting to them. In addition to directly supervising Business Manager Moore and people in similar positions, Stewart and Brewer also directly supervised two or three deputy wardens. (ECF No. 61-24, PageID.895; ECF No. 61-31, PageID.1242, 1244.) The deputy wardens, in turn, directly or indirectly supervised captains, lieutenants, and down the line. (ECF No. 61-31, PageID.1242, 1244.) Although everyone in the chain of command was responsible for enforcing policies related to gender-based misconduct, Warden Stewart and Warden Brewer were ultimately responsible for ensuring that the

7

polices were enforced at WHV. (ECF No. 61-31, PageID.1242, 1254; ECF No. 61-24, PageID.915.) They were also responsible for assigning someone to investigate allegations of sexual misconduct. (ECF No. 61-31, PageID.1248, 1254.)

WHV also employed three people in the position of "inspector." (ECF No. 61-31, PageID.1262.) Inspectors specialized in investigations. (ECF No. 61-24, PageID.901.) Indeed, it appears that, in many cases, wardens would assign an inspector to look into claims of staff gender-based misconduct. (*See* ECF No. 57-9, PageID.594; ECF No. 61-24, PageID.901; ECF No. 61-31, PageID.1258.)

**C.**

With all of that background, the Court turns to the specific events giving rise to this suit.

According to Beausoleil, Laughlin sexually harassed or abused her many times beginning in June 2016 and continuing through July 2017. In June 2016, Laughlin told Beausoleil at least four times in the warehouse area, "I would love to see you touch yourself." (ECF No. 57-14, PageID.655.) That month, Laughlin also asked Beausoleil to help him with Microsoft Excel on his office computer; while Beausoleil was working on the computer, Laughlin reached over and "cupped" Beausoleil's breast. (*Id.* at PageID.656.) A similar incident occurred about a week later. (*Id.* at PageID.656.) Then, in December 2016, Laughlin again asked for help with Excel, and while Beausoleil was working on the computer, Laughlin started rubbing Beausoleil's genitals. (*Id.* at PageID.657.) In January 2017, Laughlin called Beausoleil over to his desk in the warehouse, and when she arrived, Laughlin had his penis exposed. (*Id.* at PageID.657.) That month, Laughlin also asked Beausoleil if she "spits or swallows?" (*Id.* at PageID.657.) Although Beausoleil stopped working in the warehouse in May 2017, when Laughlin was making a delivery to Beausoleil's housing unit in July 2017, he commented that Beausoleil had a "nice rack." (*Id.* at PageID.657.)

Scholl also recalls experiencing repeated sexual harassment and abuse from Laughlin while she worked at the warehouse. In April 2017, Laughlin asked Scholl if she was horny. (ECF No. 57-7, PageID.583.) The next month, Laughlin touched Scholl's breast and slapped her butt near his office in the warehouse. (ECF No. 61-29, PageID.1158–1159.) In June 2017, while Scholl was working in the warehouse, Laughlin motioned to Scholl with one finger, and after she approached, Laughlin stated that he "wanted to see if I could make you come with one finger." (ECF No. 61-29, PageID.1159; ECF No. 57-7, PageID.583.) In August 2017, after Scholl had completed a task and was walking away, Laughlin put his hand between Scholl's legs. (ECF No. 61-29, PageID.1162.) In October 2017, again in the warehouse, Laughlin unzipped his pants and exposed his penis to Scholl. (*Id.* at PageID.1164.) In December 2017, Scholl was bent over checking on a bag on the floor and Laughlin was standing beside her; when she turned toward Laughlin, Laughlin had again exposed himself. (*Id.* at PageID.1166.) Finally, in January 2018, Laughlin "tweaked [Scholl's] left nipple through [her] shirt" and again exposed himself to Scholl. (ECF No. 61-29, PageID.1167.)

## D.

At least for purposes of summary judgment, the parties do not dispute that Laughlin committed these acts. Nor do they dispute that while these acts were occurring, Beausoleil and Scholl never reported them to anyone employed by the MDOC. (ECF No. 57, PageID.488–492; ECF No. 61, PageID.698–699, 725.) Given these two points of agreement, resolution of Defendants' motion largely turns on answering these two questions: What did Business Manager Moore, Warden Stewart, Warden Brewer, and others know about Laughlin's behavior? And what did they do about it? The following are the facts that help answer those questions.

**1.**

On February 2, 2017, one of the inspectors at WHV was monitoring the cameras. (At this time, Beausoleil had been working in the warehouse for about 10 months, and Scholl had been working there for about one month.) The inspector observed Laughlin entering a housing unit at least twice without announcing "male in the area." (ECF No. 61-16, PageID.851, 853.) On one occasion, Laughlin failed to announce "male in the area" when entering the housing unit area directly across from the prisoners' bathroom. (*Id.* at PageID.853.) And later on February 2, the inspector also saw Laughlin sitting and eating with female prisoners. (*Id.*) She also observed a prisoner called Laughlin "Norm." (*Id.*) A moment or two later, the inspector heard Laughlin say to the prisoner, "only if I like you." (*Id.*)

In March 2017, Vincent Gauci, a captain at WHV, conducted an investigation to verify the inspector's observations. (*See* ECF No. 61-16, PageID.851.) In responding to Gauci's questionnaire, Laughlin denied or otherwise attempted to explain everything. (ECF No. 61-16, PageID.854.) But Gauci reviewed the camera footage himself and confirmed the inspector's account. (*See* ECF No. 61-16, PageID.852–853.)

In April 2017, Gauci authored a memo to the MDOC's Internal Affairs Section. (ECF No. 61-16, PageID.851.) Regarding Laughlin's eating with prisoners and allowing prisoners to call him "Norm," Gauci explained that there was sufficient evidence of "conduct unbecoming," a work rule violation. (ECF No. 61-16, PageID.855.) Regarding Laughlin's failure to announce "male in the area" while entering the housing unit, Gauci found that Laughlin violated the work rule requiring employees to follow all department procedures. (*Id.*)

Although Laughlin had been caught on camera in February 2017, it was not until August 2017—six months later—that discipline was imposed on Laughlin. In June 2017, Warden Stewart

signed an "Employee Discipline Report," but Stewart indicated that due to the nature of the charges, a discipline coordinator would determine the appropriate discipline. (*Id.*) The next month, Laughlin, apparently represented by a labor union, signed a "settlement agreement." (ECF No. 61-17, PageID.858.) He agreed to a ten-day suspension without pay as a "resolution to this matter." (*Id.*) The discipline coordinator signed the settlement agreement on August 1, 2017. (ECF No. 61-17, PageID.857–858.) According to the discipline report, Laughlin, who had worked at WHV since 2009, had no prior disciplinary record. (*See* ECF No. 61-17, PageID.857.)

During the six months between the time the inspector caught Laughlin violating work rules and the settlement agreement, Laughlin continued to work at WHV. (*See* ECF No. 61-17, PageID.857.) That included working with Scholl in the warehouse during that entire six-month period and working with Beausoleil in the warehouse for four of those months (February through May 2017). Laughlin sexually abused Scholl during this time and at least exposed Beausoleil to a substantial risk of abuse during this time.

## 2.

During the six-month period between Laughlin's knock-and-announce violation and his settlement, WHV staff who were not involved in investigating that misconduct became aware of other misconduct by Laughlin. In particular, three kites were sent indicating that Laughlin had engaged in overfamiliar or other gender-based misconduct.

The first kite was sent in or around early February 2017 (almost exactly the same time that the inspector had caught Laughlin breaking rules on camera). The kite was from a prisoner LZ to Howard, Laughlin's direct supervisor. (ECF No. 61-18, PageID.870.) In her kite, LZ mostly explained that other prisoners had been treating her badly, that Laughlin had encouraged the prisoners to do so, and that Laughlin himself had ridiculed and demeaned her. (*See e.g.*, ECF No.

11

61-18, PageID.870, 873.) But a few sentences of the four-page kite indicated gender-based misconduct by Laughlin. LZ informed Howard (notably using Laughlin's first name), "While Norm flirts always with so many girls and is inappropriate he opens their bags to play and makes very flirtatious comments to them which I have seen and heard. Just watch the cameras on store day." (ECF No. 61-18, PageID.871.) LZ also wrote, "Norm is a hypocrite because he has the nerve to flirt with so many girls and then tries to act so proper when it comes to me by making me feel worthless. [S], the store worker I saw at the visitor's room[,] [S] has a crush on Norm." (ECF No. 61-18, PageID.872.)

On February 6, 2017, Laughlin's supervisor emailed copies of LZ's kite to three WHV staff persons. Howard first sent a copy of the kite to an Assistant Resident Unit Specialist (ARUS); his email to the ARUS stated, "Ms. Cowan can you please advise how we should handle this letter? Prisoner sounds a bit unstable to me. I didn't want this to be swept under the rug." (ECF No. 61-18, PageID.869.) Later that same day, Howard forwarded a copy of LZ's kite to Johnson, the Deputy Warden of Custody and Security. (*Id.*) In his email to Johnson, Howard included his earlier, "bit unstable" note to the ARUS. (*Id.*) Howard also copied his supervisor, Business Manager Moore, on the email to Johnson. Howard wrote, "Deputy [Johnson] and Ms. Moore . . . . please see attached letter for your disposition. I have already advised Mr. Laughlin that a note was sent." (ECF No. 61-18, PageID.869.)

The record contains little evidence of what happened next. There is a cryptic reference in one of Laughlin's later disciplinary reports that says, "6-22-17 5 day settlement [Work Rules] #5, 13, 38, 50." Perhaps this pertains to LZ's kite: June 22, 2017 post-dates the kite and Work Rule 50 prohibits staff from being overfamiliar with prisoners. (ECF No. 57-9, PageID.591; ECF No. 61-3, PageID.787.) But it is possible that this cryptic reference is related to the knock-and-

announce violation or, at least, completely unrelated to LZ's February 2017 kite. As far as testimony, while Deputy Warden Johnson was asked about other kites during his deposition, he was not asked about LZ's February 2017 kite. (*See* ECF No. 61-27, PageID.1077–1081.) As for Business Manager Moore, she testified that it would have been Johnson's responsibility to address issues of this variety since he was the Deputy Warden of Custody and Security: "[it] would be something that he would follow up with his inspectors." (ECF No. 61-26, PageID.1027.) Moore never followed up with Johnson regarding the kite. (*Id.*)

On or around July 5, 2017—after Beausoleil had stopped working at the warehouse but while Scholl was still working there—LZ wrote a second kite to Laughlin's supervisor, Howard. LZ informed Howard that an ARUS and Laughlin would flirt and that the ARUS "rub[bed] up against him and she always touche[d] him." (ECF No. 61-18, PageID.865.) (It appears that this ARUS was the one to whom Howard had forwarded LZ's February 2017 kite.) LZ also told Howard that Laughlin had a girlfriend who was a prisoner and that Laughlin would "caress her hard and show his overfamiliarness to her." (ECF No. 61-18, PageID.865.) LZ further wrote, "[T]he girls in Unit 2 always brag that Norm is their boyfriend. He constantly flirts with the girls in Unit 2. They say on the walkway that they pleasure themselves when Norm comes. They bend over to expose their cleavage and he loves it. The reason Norm never takes off on Unit 2 is because he has overfamiliar relations with some of the girls." (ECF No. 61-18, PageID.865.)

While Scholl recalls Howard laughing about LZ's complaints, (ECF No. 61-29, PageID.1177), Howard apparently did pass on LZ's July 2017 kite to his supervisor, Business Manager Moore. (ECF No. 61-26, PageID.1014, 1029.) And on July 5, 2017, Moore forwarded a copy to Deputy Warden Johnson. Moore wrote to Johnson, "Please see attached. This prisoner continues to write these kites that reflect that she has a fixation on Norm Laughlin. She is paroling

tomorrow. Is there anything that should be or has been done about this? Perhaps a discussion with her parole agent that she should not attempt to contact Mr. Laughlin?" (ECF No. 61-18, PageID.863.)

As with the prior kite from LZ that reached Johnson, there is little evidence of what happened next. There is no paper trial. And when later asked about what he did with this kite, Johnson testified, "I don't recall" (ECF No. 61-27, PageID.1078) and "I have no idea" (ECF No. 61-27, PageID.1080). Johnson did testify that for sexual allegations like the ones in LZ's July 2017 kite, he would send the kite to one of the inspectors or would have assigned someone to first conduct an informal investigation, and depending on what that revealed, a formal investigation. (ECF No. 61-27, PageID.1081; *see also id.* at PageID.1079.) According to Johnson, "[o]nce we determine that there is something that needs to be investigated further, it goes to the warden's office, and it is officially assigned out." (ECF No. 61-28, PageID.1079.) Johnson indicated that the initial, informal investigation would not result in a written report. (ECF No. 61-28, PageID.1079.) Notably, Johnson received this second kite from LZ shortly after Laughlin's disciplinary conference for the knock-and-announce violation, but a few weeks before the August 1 settlement of that matter.

In August 2017, shortly after the settlement of the knock-and-announce violation, Moore received a third kite about Laughlin. In contrast to the prior two kites, this one was not authored by LZ and not addressed to Howard, it was addressed to Moore or "Prison Inspector". (ECF No. 61-18, PageID.862.) (Howard had been suspended a week earlier for having a sexual relationship with a parolee who had worked in the warehouse. (ECF No. 61-19, PageID.875.)) This third kite stated, "This kite needs to be dealt with immediately. Prisoner [DH] is currently hav[ing] a relationship with a male store keeper—'Norm.' Sex is involved." (ECF No. 61-18, PageID.861.)

On August 29, 2017, Moore forwarded a copy of the kite to Johnson. (ECF No. 61-18, PageID.860.) Moore wrote, "Attached, for your review and disposition is a kite I received regarding Norman Laughlin, Storekeeper. I will place the original in the mail." (ECF No. 61-18, PageID.860.)

As with the other two kites, there is no documentary evidence showing what Johnson did (or did not do) in response to Moore's email. And, when asked about the August 2017 kite, Johnson testified: "I don't recall this," "I don't remember the incident, period," and "I don't recall. I get this all the time." (ECF No. 61-27, PageID.1078.) He did testify that in the usual course, he would have assigned someone, "probably an inspector," to conduct an informal investigation and, depending on what that revealed, a formal investigation from the warden's office would have been conducted. (ECF No. 61-27, PageID.1079.)

### 3.

Although it is not known whether anything was done in response to the February, July, and August 2017 kites about Laughlin's gender-based misconduct, something was done in response to a fourth communication about Laughlin. This was a November 2017 letter concerning former WHV prisoner, KN. (ECF No. 61-20, PageID.877.)

The November 2017 letter was sent from the address of a law firm and was authored by someone with the initials "GC"—a friend of KN's. (ECF No. 61-20, PageID.878.) GC wrote, "[Norm Laughlin] molested KN on her last working day at the warehouse [March 27, 2017]. He called her back in his area, grabbed her, felt her up, grabbed her breasts, and said, 'I told you I was going to get me some before you leave.'" (ECF No. 61-20, PageID.877.) GC also asserted that a prisoner TS had reported Laughlin's abuse to both Howard and Moore, but nothing had been done. (*Id.*) GC's letter further stated, "No wonder Norm is allowed to fool around with prisoners and get

15

away with it. His supervisors and department heads seem to just sweep these issues under the rug with no consequences." (ECF No. 61-20, PageID.878.) GC also informed that Laughlin was Facebook friends with eight female prisoners or parolees. (ECF No. 61-20, PageID.877.)

Warden Brewer received GC's letter on January 26, 2018 (ECF No. 61-24, PageID.929–930; ECF No. 57-8, PageID.586) and took action. (Brewer took over for Stewart as warden in July 2017.) On the day he received the letter, Brewer both barred Laughlin from the WHV premises pending an investigation (ECF No. 57-8, PageID.589) and informed his supervisor, MDOC Assistant Deputy Director Lloyd Rapelje, about the letter (ECF No. 57-8, PageID.586). About a week later, Brewer assigned a WHV inspector to conduct an investigation into the allegation in GC's letter. (ECF No. 57-9, PageID.604.)

The inspector interviewed witnesses and served questionnaires. (ECF No. 57-9, PageID.595–596.) Laughlin denied virtually everything. (*See* ECF No. 57-9, PageID.597–598.) Howard, Laughlin's supervisor, had been fired at this point and did not return his questionnaire. (ECF No. 57-9, PageID.597.) Business Manger Moore "indicated she never received a kite/letter from a prisoners indicating Norman Laughlin made inappropriate remarks to any prisoners." (ECF No. 57-9, PageID.601.) But Moore did provide the inspector with copies of the February and July 2017 kites from LZ that had been forwarded to her by Howard. (*Id.*)

All of the prisoners the inspector interviewed denied that any misconduct occurred. The inspector interviewed DH, the subject of the August 2017 kite asserting that Laughlin and DH were in a relationship and "[s]ex is involved." DH indicated that to her knowledge, Laughlin "did not have a non-professional relationship with any offender" and that "she was never offended by anything Mr. Laughlin ever said." (ECF No. 57-9, PageID.600.) As for TS, the prisoner GC believed had reported Laughlin's abuse to both Howard and Moore, she "indicated she didn't see

or hear anything." (ECF No. 57-9, PageID.596.) Scholl was interviewed too; she indicated that she had heard Laughlin say things like "F this or F that," but "nothing sexually" and that to her knowledge, Laughlin "did not have a non-professional relationship with any offender." (ECF No. 57-9, PageID.601.) (Scholl would later explain that she believed that there was no way for her to report Laughlin's abuse without retaliation from prisoners or staff. (*See* ECF No. 61-29, PageID.1160, 1168.))

In the end, the inspector found sufficient evidence of a work-rule violation—but not one relating to sexual harassment or sexual abuse. Because Laughlin was Facebook friends with active offenders, the inspector found that he had violated a work rule prohibiting "overly-familiar unauthorized contact." (ECF No. 57-9, PageID.603.) But, given the responses from the inmates interviewed, the inspector found that sexual harassment or abuse had not been substantiated. (*Id.*)

As noted, Laughlin was suspended in January 2018 upon Warden Brewer's receipt of GC's letter. Laughlin never worked at WHV after that point. And in August 2018, he was fired. (ECF No. 57-9, PageID.591.) The basis for the discharge was that Laughlin had been Facebook friends with current or former WHV prisoners. (*Id.*)

## E.

Beausoleil was released from WHV in March 2018 (ECF No. 57-14, PageID.655), and Scholl was released from WHV in March 2019 (ECF No. 61-29, PageID.1149).

Two months after her release from WHV, Beausoleil filed an Equal Employment Opportunity Commission charge. (ECF No. 57-14, PageID.644.) The charge asserted, "From May 2016 and as recently as July 19, 2017, I was subjected to unwelcome sexual harassment by the Store Keeper, who was employee of the State of Michigan." (*Id.*) In July 2018, the EEOC closed

its file on the charge, indicating that there was no employer-employee relationship. (ECF No. 57-14, PageID.647.)

Later that month, MDOC received a copy of the charge, which eventually led to two internal investigations: one into Beausoleil's allegations about Laughlin, another into Scholl's. (ECF No. 57-14, PageID.644, 647–648, 652, 654.) While conducting the two investigations, the MDOC also notified the Michigan State Police of Beausoleil's and Scholl's allegations. (ECF No. 57-14, PageID.648, 654; ECF No. 57-15, PageID.677.) Both of the MDOC's investigations ended with findings of "insufficient evidence" of overfamiliar contact or sexual conduct with an offender. (ECF No. 57-14, PageID.664; ECF No. 57-15, PageID.676.)

The Michigan State Police apparently reached a different conclusion. In particular, Laughlin was charged with six crimes: four counts of second-degree criminal sexual conduct and two counts of indecent exposure. *People v. Laughlin*, Case No. 20-000169-FH (Mich. 22d Cir. Ct. filed Feb. 20, 2020). In August 2020, Laughlin pled no contest to two counts of second-degree criminal sexual conduct, and the other four counts were dismissed. *See id.*

### F.

In October 2018, before Laughlin was prosecuted criminally, Beausoleil and Scholl filed this lawsuit against Laughlin, Business Manager Moore, Warden Stewart, Warden Brewer, and people higher up in the MDOC. (ECF No. 1.)

In May 2019, Beausoleil and Scholl filed their third amended complaint, which contains six counts. (ECF No. 30.) Beausoleil and Scholl assert that Laughlin's abuse while they were imprisoned amounted to "cruel and unusual punishment" prohibited by the Eighth Amendment. (*See* ECF No. 30, PageID.305.) As for Moore, Stewart, Brewer and the other defendants, Beausoleil and Scholl claim that they were aware of a substantial risk of serious harm (sexual

18

harassment or assault), yet chose to disregard that risk, also a violation of the Eighth Amendment. (*See id.* at PageID.301–302.) Beausoleil and Scholl also assert that even if Moore and others did not directly violate the Eighth Amendment, they are liable for Laughlin's abuse under the doctrine of supervisory liability. (*See id.* at PageID.303–304.) Beausoleil and Scholl also bring five state-law claims, including hostile-environment claims under Michigan's Elliott-Larsen Civil Rights Act against all the defendants, and an assault-and-battery claim against Laughlin. (*See id.* at PageID.305–309.)

In July 2019, Laughlin was found in default because he failed to answer the complaint. (ECF No. 41.) When he was later deposed, he asserted his Fifth Amendment right and answered no questions. (ECF No. 53, PageID.436.)

In April 2020, every defendant except for Laughlin moved for summary judgment. (ECF No. 61, PageID.686.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

The Court begins with Beausoleil's and Scholl's claims that Defendants violated the Eighth Amendment.

### A.

The Eighth Amendment of the Constitution prohibits prison officials from imposing "cruel and unusual punishments." And a prison official imposes cruel and unusual punishment on a prisoner when the official disregards a substantial risk that the prisoner will experience serious

harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To break down that last sentence, a prisoner must prove three elements. *See Beck v. Hamblen Cty., Tennessee*, 969 F.3d 592, 600 (6th Cir. 2020). For one, a prisoner must show that she was at risk of "objectively, sufficiently serious" harm. *Farmer*, 511 U.S. at 834. For two, the prisoner must show that the prison official—himself or herself—inferred that there was a "substantial risk" of the harm occurring. *Id.* at 837, 844; *see also id.* at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Finally, a prisoner must show that the prison official, despite inferring a substantial risk of serious harm, failed to respond "reasonabl[y]." *Id.* at 845.

Even when a plaintiff establishes a violation of the Eighth Amendment (or convinces a judge that a reasonable jury could find such a violation), a defendant can, as here, assert the affirmative defense of qualified immunity. (ECF No. 57, PageID.505.) Prison officials can mistakenly violate the law. If that mistake is reasonable, qualified immunity shields busy prison officials from the hassle of a lawsuit. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.").

A plaintiff has the burden of showing that the official's violation of law was not reasonable, i.e., a plaintiff must show that precedent gave clear notice to the official that his or her contemplated action would violate the Constitution. *See Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020). In this case, that means that Beausoleil and Scholl must show that precedent placed the unconstitutionality of each defendant's conduct "beyond debate." *See Ryan v. Blackwell*, 979 F.3d 519, 527 (6th Cir. 2020). Beausoleil and Scholl can "meet [their] burden . . . by presenting caselaw

with a fact pattern similar enough to have given fair and clear warning to officers about what the law requires." *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (internal quotation marks omitted).

## B.

One of the three elements of Beausoleil and Scholl's claim is not disputed by the parties. (*See* ECF No. 57, PageID.496–505; ECF No. 61, PageID.720.) Laughlin's sexual abuse of Beausoleil and Scholl is "objectively, sufficiently serious" harm for purposes of the Eighth Amendment. *Rafferty v. Trumbull Cty., Ohio*, 915 F.3d 1087, 1095 (6th Cir. 2019) ("Federal courts have long held that sexual abuse is sufficiently serious to violate the Eighth Amendment."); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("[T]here can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation."), *quoted with approval in Jackson v. Madery*, 158 F. App'x 656, 662 (6th Cir. 2005).

And while not all verbal harassment of a prisoner is cruel and unusual, the repetitive and sexually explicit remarks alleged in this case are sufficiently serious for an Eighth Amendment claim. *See Rafferty*, 915 F.3d at 1095 ("[The corrections officer's] repeated demands that [the prisoner] expose her breasts and masturbate are 'sufficiently serious' to implicate the Eighth Amendment under settled case law from the Supreme Court, this Circuit, and numerous other courts of appeals.").

So the dispute in this case centers on the other two elements of an Eighth Amendment claim: (1) whether the prison official inferred a substantial risk of serious harm and, if so, (2) whether he or she responded reasonably to that inference. Because the first question examines a prison official's state of mind, and because the second question examines the official's actions,

21

each of the defendant's liability must be assessed separately. *See Rouster v. Cty. of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014).

## C.

The Court starts with Moore. Recall that Moore was the Business Manager of WHV and in charge of warehouse operations. (ECF No. 61-26, PageID.995.) Although Howard directly supervised Laughlin, Moore was either Howard's direct supervisor or, at times, there was an Assistant Business Manager between her and Howard. (ECF No. 61-26, PageID.999, 1026.)

A reasonable jury could find that Moore inferred that there was a substantial risk that Laughlin was sexually abusing female prisoners. To start, Moore was aware of the history of male staff sexually abusing female prisoners, including the *Neal* litigation. (ECF No. 61-26, PageID.1017.) And she was aware that there were times when Laughlin would supervise female prisoners. (ECF No. 61-26, PageID.1015.) More importantly though, Moore received kites in February, July, and August 2017 that explicitly stated that Laughlin was engaged in sexual misconduct. The February 2017 kite stated, "Norm flirts always with so many girls and is inappropriate he opens their bags to play and makes very flirtatious comments to them which I have seen and heard. Just watch the cameras on store day." (ECF No. 61-18, PageID.871.) The July 2017 kite stated that Laughlin would "caress [a female prisoner] hard and show his overfamiliarness to her." (ECF No. 61-18, PageID.865.) The July kite also suggested that Laughlin's sexual misconduct was widespread: "[T]he girls in Unit 2 always brag that Norm is their boyfriend. He constantly flirts with the girls in Unit 2. They say on the walkway that they pleasure themselves when Norm comes. They bend over to expose their cleavage and he loves it." (ECF No. 61-18, PageID.865.) And in August 2017, Moore received a kite that stated, "This kite needs to be dealt with immediately. Prisoner [DH] is currently hav[ing] a relationship with a male

store keeper—'Norm.' Sex is involved." (ECF No. 61-18, PageID.861.) Given these kites about Laughlin's sexual misconduct with prisoners, a reasonable jury could find that Moore inferred that there was a substantial risk that Laughlin was sexually abusing prisoners.

That said, portions of Moore's testimony suggest that while she should have inferred a substantial risk of sexual abuse, she, personally, did not draw the inference. *See Farmer*, 511 U.S. at 844 ("Prison officials charged with deliberate indifference might show, for example, . . . that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."). In particular, Moore testified that she interpreted the February and July 2017 kites from prisoner LZ as someone who "seemed to be more focused on wanting Mr. Laughlin to provide her additional attention, the same kind of attention he gave to others." (ECF No. 61-26, PageID.1027.) There are portions of the February and July 2017 kites that lend some support to that interpretation. (*See* ECF No. 61-18, PageID.867, 872.) But a reasonable jury could find that Moore also read the portions of the February and July 2017 kites expressly stating that Laughlin "flirts always with so many girls" and that he "caresses [a prisoner] hard and shows his overfamiliarness to her." And the August 2017 left no room for Moore to draw an inference aside from sexual misconduct: "Prisoner [DH] is currently hav[ing] a relationship with a male store keeper—'Norm.' Sex is involved."

Thus, the question becomes whether Moore's response was reasonable.

Some facts suggest that Moore responded reasonably to the risk of sexual abuse. To start, Moore was not Laughlin's direct supervisor (and, perhaps, not even the direct supervisor of Laughlin's supervisor). (ECF No. 61-26, PageID.999 ("I am a third-line supervisor of the warehouse operation. . . . There are two supervisors below me.").) In fact, Moore supervised many persons and several operations at WHV aside from the warehouse operations. (ECF No. 61-26,

PageID.995.) And Moore's primary responsibility at WHV was not security or safety. (ECF No. 61-26, PageID.995.) Second, this is not a case where Moore did nothing with the kites she received. To the contrary, she forwarded the July and August 2017 kites to Johnson, the Deputy Warden of Custody and Security. (Howard sent the February 2017 kite to Johnson.) As Moore explained, "I referred it to Deputy Johnson, because it would be his area that would address this issue. . . . His inspectors would be responsible for investigating if they deemed it needed to be investigated. . . . When I receive allegations, . . . I sent it on to Deputy Johnson for investigation. That's the procedure." (ECF No. 61-26, PageID.1027; *see also id.* at PageID.1029 ("Again, I didn't look into it because it was not the procedure. . . . I would not be responsible for investigating anything of this nature.").) Moore added, "If I didn't care, I would not have passed this on to the deputy." (*Id.* at PageID.1033.) Further, Moore testified that the "business office" received many, perhaps 50, kites a day. (*See* ECF No. 61-26, PageID.1019.) Given the volume, forwarding kites to the departments most suited for handling the subject-matter of the kite is arguably a reasonable way to triage.

But other facts strongly suggest that Moore's response to the July and August 2017 was unreasonable. First, these were not kites about say, a late store delivery; these kites described the same MDOC staff member sexually harassing or abusing prisoners. Indeed, the WHV operating procedure informed staff that "[i]t . . . is a felony for staff to engage in sexual contact with a prisoner." (ECF No. 61-21, PageID.883.) And consider the light under which the kites should have been read: a history of male staff sexually abusing female prisoners in the MDOC.

Second, Moore had the authority to investigate Laughlin but chose not to. Laughlin was in Moore's chain of command and he worked in the warehouse. (ECF No. 61-26, PageID.999, 1026.) And Moore testified that she was "responsible for ensuring that [her] areas are compliant with

security policies and procedures." (ECF No. 61-26, PageID.996; *see also id* at PageID.995.) These procedures included prohibiting staff from having any sexual contact with prisoners. (ECF No. 61-4, PageID.801–802.) In fact, the WHV operating procedure arguably required, and at least enabled, Moore to "[d]etermine what actions, if any, should be taken to ensure the safety of the alleged prisoner victim." (ECF No. 61-4, PageID.804.) And Warden Stewart indicated that Moore had the authority to request an investigation. (ECF No. 61-31, PageID.1263.) Yet Moore never investigated her subordinate. Moore never even expressly requested that anyone investigate her subordinate. And she never followed up to see what action Johnson took.

Worse, Moore arguably deterred an investigation into Laughlin's misconduct. When forwarding the July 2017 kite to Johnson, Moore cast LZ, instead of Laughlin, as the wrongdoer: "This prisoner continues to write these kites that reflect that she has a fixation on Norm Laughlin. She is paroling tomorrow. Is there anything that should be or has been done about this? Perhaps a discussion with her parole agent that she should not attempt to contact Mr. Laughlin?" (ECF No. 61-18, PageID.863.) A reasonable jury could find that Moore's framing of the July 2017 kite dissuaded Johnson from reading the kite in detail and learning, for example, that Laughlin would "caress [a female prisoner] hard and show his overfamiliarness to her."

In sum, Moore knew of extremely serious allegations against Laughlin, never investigated Laughlin, never requested an investigation of Laughlin, arguably discouraged an investigation of Laughlin, and never followed up on an investigation of Laughlin. A reasonable jury could thus find that by merely passing the buck to Johnson, Moore was deliberately indifferent to the substantial risk that Laughlin was sexually abusing prisoners.

But what about qualified immunity? At least by 2011, it was clearly established that prisoners have a "constitutional right to be free from deliberate indifference to assault and sexual

abuse." *Bishop v. Hackel*, 636 F.3d 757, 765–66 (6th Cir. 2011); *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) ("[I]t is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment."). In other words, Moore was on notice that she could not disregard a substantial risk that Laughlin was sexually abusing prisoners. Yet, as discussed, a reasonable jury could find that by merely forwarding kites to Johnson, Moore was "deliberate[ly] indifferen[t] to assault and sexual abuse." *Bishop*, 636 F.3d at 765; *see also id.* ("We have recognized that a prison official may be held to be deliberately indifferent to a substantial risk to inmate safety if [s]he is aware that an inmate is vulnerable to assault and fails to protect [her]."). So Moore is not entitled to qualified immunity.

That almost completes the analysis of Beausoleil's and Scholl's Eighth Amendment claims against Moore. But in addition to asserting that Moore is directly liable for violating the Eighth Amendment, Beausoleil and Scholl also claim that Moore is indirectly liable under the doctrine of supervisory liability. (ECF No. 61, PageID.726–728.)

From this Court's perspective, the standard for supervisory liability in the Sixth Circuit is not entirely clear. On the one hand, there is precedent suggesting that a supervisor's knowledge of her subordinate's unconstitutional conduct coupled with a failure to take corrective action is not enough to hold the supervisor liable under 42 U.S.C. § 1983. *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988) ("At best, [Plaintiff] has merely claimed that the appellants were aware of alleged [sexual] harassment, but did not take appropriate action. This is insufficient to impose liability on supervisory personnel under § 1983."); *Walters v. Stafford*, 317 F. App'x 479, 486 (6th Cir. 2009) ("A plaintiff must show that a supervising officer did more than . . . showed mere tacit approval of the goings on."); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) (providing that supervisory liability cannot "be based solely on the right to control employees or

simple awareness of employees' misconduct"). But the Sixth Circuit has also indicated that a supervisor can be held liable if she "implicitly authorized, approved[,] or *knowingly acquiesced* in the unconstitutional conduct of the offending subordinate." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487–88 (6th Cir. 2020) (emphasis added); *accord Hays v. Jefferson Cty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). These authorities do not clearly distinguish the difference between "tacit approval" and "knowing acquiescence." A failure to act while knowing of a subordinate's unconstitutional conduct sounds like "knowing acquiesce[nce]." Yet the former does not render a supervisor liable and the latter does. *Compare Poe*, 853 F.2d at 429; *Walters*, 317 F. App'x at 486; *McQueen*, 433 F.3d at 470, *with Troutman*, 979 F.3d at 487–88; *Hays*, 668 F.2d at 874.

Examining the facts of a few cases provides some—but not complete—clarity on the legal standard. Take *Poe*, for instance. Although the Sixth Circuit stated that the supervisors' mere knowledge that Poe was being sexually harassed was not enough to trigger liability under § 1983, the supervisors in that case did not stand idly by while their subordinate harassed Poe; to the contrary, "the record show[ed] that no less than three separate investigations of Poe's complaint were initiated during the events in question." 853 F.2d at 427. And while the Sixth Circuit stated that supervisory liability cannot be premised on "a mere failure to act" in *Shehee v. Luttrell*, the supervisors there merely failed to remedy their subordinates' wrongdoing after it had already occurred. *See* 199 F.3d 295, 298, 300 (6th Cir. 1999). In *Leach v. Shelby County Sheriff*, jail personnel mistreated a paraplegic detainee, the sheriff in charge of the jail took no corrective action, and there were other instances where paraplegic detainees were mistreated at the same jail. 891 F.2d 1241, 1243, 1246 (6th Cir. 1989). Although there was no evidence that the sheriff "directly participated in or encouraged the alleged deprivations," there was "some evidence that

the Sheriff implicitly authorized, approved, or knowingly acquiesced in the action of the responsible jail personnel as shown by the fact that it was not isolated or confined to plaintiff . . . and that he failed subsequently to punish the responsible individuals." *Id.* at 1246.

In light of these cases, the Court will allow Beausoleil's and Scholl's supervisory liability claim against Moore to survive summary judgment. Moore did not investigate like the supervisors in *Poe*. And unlike the supervisors in *Shehee* who were faulted for not fixing a problem after it happened, Moore is accused of not stopping Laughlin while the misconduct was ongoing. And the three kites provided a pattern similar to the pattern that suggested knowing acquiescence in *Leach*. Thus, a reasonable jury could find that Moore "knowingly acquiesced" in Laughlin's unconstitutional conduct. And, even if the supervisory liability standard requires a greater showing, allowing Beausoleil and Scholl to proceed on this theory makes little practical difference to the litigation: the proofs that will be presented at trial for a direct Eighth Amendment violation and a supervisory liability theory are the same, and, at the close of proofs, the Court can decide whether the jury should be instructed on supervisory liability.

In short, Beausoleil's and Scholl's Eighth Amendment claims against Moore survive summary judgment.

## D.

The Court next turns to Moore's direct supervisor, Warden Anthony Stewart, and whether a reasonable jury could find that Stewart was deliberately indifferent to a substantial risk of sexual abuse.

Beausoleil's and Scholl's Eighth Amendment claims against Stewart are not nearly as strong as their claims against Moore (and Laughlin). Unlike Moore, there is no evidence than any of the February, July, or August 2017 kites about Laughlin's sexual abuse ever reached Stewart.

The trail seems to dead-end with Deputy Warden Johnson. Indeed, when Beausoleil and Scholl's counsel deposed Stewart, counsel indicated that at least the February 2017 kite never reached Stewart. (*See* ECF No. 61-31, PageID.1263 ("[F]rom what I know, it did not get to you.").) And Stewart left WHV in early July 2017 (*see* ECF No. 61-24, PageID.89), which was before the August 2017 kite and, possibly, before the July 2017 kite too. So, on this record at least, there is no basis to find that Stewart was aware of the three kites.

But that is not dispositive. The question is whether Stewart inferred a substantial risk of sexual abuse by warehouse staff, and Stewart could have drawn that inference from other information. In other words, the Court must broaden its view from the three kites to the record as a whole.

Taking that broader view, some evidence surely favors Stewart. For one, consider the nature of his job: WHV had around 2,000 prisoners and 580 staff, and Stewart directly supervised ten or so people. (ECF No. 61-31, PageID.1241; ECF No. 61-24, PageID.895.) Given that Stewart was effectively running a small town, he could not focus on the warehouse and its staff. To the contrary, he needed to rely on his subordinates—including Deputy Warden Johnson and Business Manager Moore—to notify him of problems in the warehouse. Yet, on this record, neither Moore nor Johnson ever notified Stewart of the kites. Second, MDOC-wide policies as well as WHV-specific policies expressly prohibited staff sexual misconduct. And at least by the time Brewer took over from Stewart as warden—but possibly during Stewart's tenure too—all WHV staff underwent a three-and-half day training specific to working with female prisoners. (ECF No. 61-31, PageID.1254; ECF No. 61-24, PageID.898.) These policies and training were put in place to try to prevent male staff from engaging in sexual misconduct. Third, WHV was rife with cameras—"well over 1,400" by one estimate, 1,700 by another. (ECF No. 61-31, PageID.1246;

ECF No. 61-32, PageID.1280.) By comparison, the typical MDOC facility had a fraction of that, 100 to 200 cameras. (ECF No. 61-31, PageID.1246.) And unlike those other MDOC facilities, WHV's cameras were equipped with audio. (ECF No. 61-31, PageID.1246.) It was not unreasonable for Stewart to think that the many cameras deterred staff sexual misconduct and that if an incident was reported, the video and audio recordings would lead to swift staff discipline. Fourth, Laughlin had worked at WHV since 2009 and the WHV warehouse had been in existence since 2011. (ECF No. 61, PageID.702; ECF No. 61-32, PageID.1281.) Yet as far as the summary-judgment record goes, there were no reported incidents of warehouse staff sexually harassing or abusing prisoners until 2017. In other words, there was no track record of abuse by Laughlin or any warehouse staff that would have drawn Stewart's busy eye to the goings-on of the warehouse.

That said, it is not this Court's role to decide whether Stewart is liable. The Court's role is limited to deciding whether a jury could rationally find Stewart liable. And having examined the evidence in the light most favorable to Beausoleil and Scholl, and having drawn all justifiable inferences from that evidence in their favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Court believes there are several reasons that a reasonable jury could find that Stewart inferred a substantial risk that warehouse staff were sexually abusing prisoners.

To start, a reasonable jury could find that Stewart was aware that, as a general matter, there is a non-trivial risk of staff sexual abuse whenever male staff work at an all-female prison. As stated by another court, "It is difficult to conceive of any setting where the power dynamic could be more imbalanced than that between a male guard and a female inmate. The jury knew that from common sense . . . . The confinement setting is a tinderbox for sexual abuse." *J.K.J. v. Polk Cty.*, 960 F.3d 367, 382 (7th Cir. 2020) (en banc). And this common-sense notion should have hit close to home for Stewart: he was aware of the *Neal* litigation, the class action alleging that male MDOC

30

staff sexually abused female prisoners. (ECF No. 61-31, PageID.1244.) Indeed, WHV's operating procedure, of which Stewart was surely aware, had rules acknowledging the heightened risk of male staff abusing female prisoners. (ECF No. 61-4, PageID.802.) Take, for instance, the one-on-one rule: "Male staff are restricted from being alone with female prisoners in one-on-one situations in areas of the facility that are not clearly visible to other prisoners or staff." (ECF No. 61-4, PageID.802.) Stewart was also presumably privy to a report generated from the Administrative Investigations Management (AIM) database. (ECF No. 61-24, PageID.932 (Warden Brewer indicated familiarity with the AIM report).) A partial reproduction of that report indicates that during Stewart's time as WHV Warden (January 2015 to July 2017), there were at least six allegations of male staff sexually harassing or assaulting a female prisoner. (ECF No. 61-9, PageID.825.) Although three of these allegations were against a single medical provider, three were against non-medical WHV staff. (*Id.*) Indeed, Stewart himself testified that he initiated or was otherwise involved in numerous investigations of sexual misconduct:

> Q. . . . Were there complaints of sexual assault . . . of female prisoners during the time you were warden there?
>
> A. Yes.
>
> Q. Okay. What occurred in that regard?
>
> A. *We received several complaints.* Every complaint that we receive is investigated. . . .
>
> Q. Were there any violations found at your facility?
>
> A. *I did probably average about a hundred investigations a year at that facility* . . . .

(ECF No. 61-31, PageID.1245 (emphases added).) In short, given the *Neal* litigation, the specific rules for male staff in the WHV operating procedure, the AIM report, and Stewart's own investigations, a reasonable jury could find that Stewart inferred that, as general matter, male staff working at an all-female prison places female prisoners at a non-trivial risk of sexual abuse.

31

Still, if all Beausoleil and Scholl could show was the ever-present risk of abuse from male staff working at an all-female correctional facility, perhaps no reasonable jury could find that Stewart inferred that there was a "substantial" risk that Laughlin was sexually abusing female prisoners. But there is additional evidence of record.

First, while Stewart should be credited for installing four cameras in the warehouse when there were previously none, a reasonable jury could find that Stewart's involvement in the installation process meant that he knew there were blind spots in the warehouse. (ECF No. 61-31, PageID.1250.) In fact, although not specifically speaking about the warehouse, Stewart testified, "I think there's blind spots all over because you can't have—I mean, it wouldn't be cost effective to have cameras that shoot every specific inch in the facility." (ECF No. 61-31, PageID.1250.) As for the warehouse specifically, Stewart conceded that it was "possible" for Laughlin to be both alone with prisoners in the warehouse and outside the cameras' views. (ECF No. 61-31, PageID.1252.)

Second, while it appears that Laughlin's sexual abuse of Beausoleil and Scholl almost always occurred where no one else could see (*see e.g.*, ECF No. 61-29, PageID.1160, 1163), according to Beausoleil, Scholl, and others, Laughlin did not hide his overfamiliar conduct with prisoners. It appears to have been widely known that prisoners called Laughlin "Norm," that he would eat with prisoners, and that he would flirt with prisoners. (ECF No. 61-28, PageID.1114, 1126; ECF No. 61-16, PageID.852; ECF No. 61-18, PageID.871.)

Finally, a reasonable jury could find that in late spring 2017, Stewart learned that Laughlin had engaged in staff gender-based misconduct. In April 2017, Gauci authored a memo to Internal Affairs finding that Laughlin had violated the knock-and-announce rule and had been overfamiliar with female prisoners (ECF No. 61-16, PageID.851, 855)—both infractions are classified as staff

gender-based misconduct under the WHV operating procedure (ECF No. 61-4, PageID.801). True, there is no evidence that Stewart received Gauci's memo, and Stewart did not sign the associated disciplinary report until June 2017. But a reasonable jury could find that Stewart was aware of either Gauci's investigation or his memo before then.

In sum, a reasonable jury could find that Stewart was aware of the general risk of male staff supervising female prisoners, aware that there were opportunities for a male staff person to be alone with a female prisoner in WHV's warehouse, aware that the cameras in the warehouse had blind spots, and aware that Laughlin was both overfamiliar with prisoners and had committed staff gender-based misconduct. And if a jury imputed all of that knowledge to Stewart, it would not be unreasonable for it to conclude that Stewart inferred that there was a substantial risk that Laughlin was sexually abusing or would sexually abuse female prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

Remaining for analysis is the final element of an Eighth Amendment claim: did Stewart respond reasonably? A reasonable jury could answer "no." Based on the evidence currently of record, Stewart never discussed with Moore, his direct report, the possibility that warehouse staff were sexually assaulting prisoners. Worse, it appears that Stewart never disclosed Laughlin's knock-and-announce violation to Moore or Deputy Warden Johnson, another direct report. That information would have cast the kites that Moore and Johnson received in February, July, and August 2017 in a more troubling light. And because Stewart signed Laughlin's disciplinary report for the knock-and-announce violation, Stewart presumably knew that Laughlin had been caught on camera engaging in gender-based misconduct. Yet Stewart never added cameras to the

warehouse to keep an eye on Laughlin. Accordingly, a reasonable jury could find that despite drawing an inference of a substantial risk of serious harm, Stewart did not respond reasonably.

Finally, as already stated in addressing Beausoleil's and Scholl's claims against Moore, it was clearly established that a prison official could not consciously disregard the substantial risk of prisoner sexual abuse. *Bishop v. Hackel*, 636 F.3d 757, 765–66 (6th Cir. 2011); *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013). Yet, as just determined, a reasonable jury could find that is what Stewart did. So Stewart is not entitled to qualified immunity.

That leaves Beausoleil's and Scholl's supervisory liability theory against Stewart. Again, this theory applies with much less force against Stewart than Moore. Unlike Moore, Stewart did not receive three kites expressly disclosing Laughlin's sexual misconduct. Further, as explained, Stewart was many levels above Laughlin in the organizational hierarchy. But the Court has decided that a reasonable jury could find that Stewart inferred a substantial risk that Laughlin was sexually abusing female prisoners. And the Sixth Circuit has suggested that is enough. *See Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487–88 (6th Cir. 2020) ("At minimum a plaintiff must show that a supervisory official at least . . . knowingly acquiesced in the unconstitutional conduct of the offending subordinate. The supervisor need not have known of the substantial risk to the injured party but rather must have possessed knowledge of potential danger to a particular class of persons." (emphases added).) In any event, as discussed above, whether this theory survives against Stewart for the time being makes no practical difference to how the litigation proceeds.

In short, Beausoleil's and Scholl's Eighth Amendment claims against Stewart survive summary judgment.

**E.**

The Court next examines Beausoleil's and Scholl's Eighth Amendment claims against Stewart's successor, Warden Shawn Brewer.

Setting aside Scholl's claims for a moment, Brewer is entitled to summary judgment on Beausoleil's Eighth Amendment claims because Brewer was not the warden at the time she worked in the warehouse. Brewer took over as WHV Warden in early July 2017 (and prior to that, he did not work at WHV). (ECF No. 61-24, PageID.894–895.) But by then, Beausoleil no longer worked in the warehouse or for Laughlin. (ECF No. 61-28, PageID.1109.) True, when Laughlin was visiting the housing units in July 2017, he said to Beausoleil, "I still think you have a nice rack." (ECF No. 57-14, PageID.657.) But that single statement, although vulgar and offensive, is not a wrong of constitutional dimension. *See Rafferty v. Trumbull Cty., Ohio*, 915 F.3d 1087, 1095 (6th Cir. 2019) ("[T]his Court has held that isolated, brief, and not severe instances of sexual harassment do not give rise to Eighth Amendment violations." (internal quotation marks omitted)). So Beausoleil's Eighth Amendment claims against Brewer will be dismissed.

That leaves Scholl's claims against Brewer. For almost the same reasons that a reasonable jury could find that Stewart was deliberately indifferent, it could find that Brewer was as well. Like his predecessor, Brewer knew about the *Neal* litigation (ECF No. 61-24, PageID.905), knew that there were specific rules about how male staff should interact with female prisoners (*id.* at PageID.936), and had access to the AIM log of staff sexual abuse at WHV (*id.* at PageID.932). Brewer was also aware that there were prisoner jobs at WHV that might allow male staff to be alone with a female prisoner. (*Id.* at PageID.908–909.) Brewer also heard allegations of male staff flirting with or engaging in sexual banter with female prisoners (*id.* at PageID.919) and heard allegations of male staff making sexual overtures to female prisoners (*id.* at PageID.905).

35

A reasonable jury could even find that Brewer was aware of a fact that Stewart was not: that blind spots in the warehouse could be used for sex. It appears that in September 2017, Brewer received a letter about GK, the parolee with whom Howard had sex in August 2017. (*See* ECF No. 61-24, PageID.934–935; ECF No. 61-9, PageID.825, 875.) The letter stated in part, "GK told me on her way home of her special friend in the prison, a supervisor in the warehouse . . . . [GK] told me that he showed her where inmates can have sex where cameras are dead." (ECF No. 61-24, PageID.934–935.)

Also, Laughlin's suspension for the knock-and-announce violation was not agreed upon until August 2017—after Brewer became the warden. (ECF No. 61-17, PageID.857–858.) And it is not a stretch to think that the warden of WHV would be informed that one of his staff was suspended for staff gender-based misconduct; the nature of that misconduct is serious enough to reach a warden's desk.

Thus, for very similar reasons that a jury could find that Stewart inferred a substantial risk that Laughlin was sexually abusing female prisoners, a jury could find that Stewart's immediate successor, Brewer, drew the same inference.

And a reasonable jury could find that Brewer's response to this inference was no better than Stewart's. True, when Brewer received the letter sent from a law firm's address about KN, Brewer immediately barred Laughlin from the WHV premises. (*See* ECF No. 57-8, PageID.589.) But nothing suggests that in the six months preceding that letter, Brewer ever discussed with Moore, his direct report, the possibility that Laughlin was sexually assaulting prisoners. Nothing suggests that Brewer discussed Laughlin's knock-and-announce violation with Moore or Johnson. And upon learning that Laughlin's immediate supervisor had a sexual relationship with a prisoner who formerly worked in the warehouse (ECF No. 61-19, PageID.875; ECF No. 61-29,

PageID.1170), nothing indicates that Brewer went to talk with Moore about the state of the warehouse. Yet, Brewer admitted, "It's my responsibility to see that prisoners are not assaulted by any staff." (ECF No. 61-24, PageID.915.) A reasonable jury could find that Brewer did not fulfill that duty.

In short, a reasonable jury could find that Brewer was deliberately indifferent to a substantial risk that Laughlin was sexually abusing female prisoners.

And, for essentially the same reasons that Scholl's supervisory liability claim against Stewart survives summary judgment, Scholl's supervisory liability claim against Brewer also survives summary judgment.

## F.

Beausoleil and Scholl have also sued a number of high-level MDOC officials. While initially naming these defendants may have been sound litigation strategy, maintaining suit against them after discovery may not have been. Not one of these officials worked at WHV, and there is scant evidence of record that any of them were deliberately indifferent to Laughlin's sexual abuse or knowingly acquiesced in his misconduct.

Before explaining why these high-level officials are entitled to summary judgment, the Court introduces them. Wardens within the MDOC reported to an Assistant Deputy Director. (ECF No. 61-25, PageID.960.) Fifteen wardens, including the one at WHV, reported to the Assistant Deputy Director of MDOC's Southern Region. (*See id.*) At times relevant to this case, Defendant Bruce Curtis (2008 to September 1, 2016), Defendant Steve Rivard (September 1, 2016 to September 2017), and Defendant Lloyd Rapelje (September 2017 to present) held the position of Assistant Deputy Director of the Southern Region. (ECF No. 30, PageID.271–72; ECF No. 61-25, PageID.960.) Curtis, Rivard, and Rapelje in turn reported to Deputy Director Kenneth McKee,

also a defendant. McKee, in turn, reported to Director Heidi Washington, also a defendant. Beausoleil and Scholl also sued Rick Snyder, the former Governor of Michigan, but have since agreed to dismiss him from this case. (ECF No. 61, PageID.695.)

No reasonable jury could find that Assistant Deputy Director Curtis or Rivard violated the Eighth Amendment under any theory. Curtis and Rivard were not deposed in this case, so there is almost nothing in the record about what they knew about WHV, the warehouse, or Laughlin. Yet an Eighth Amendment claim requires a showing what each defendant personally knew and inferred. *See Farmer*, 511 U.S. at 837.

Assistant Deputy Director Rapelje was deposed, but his testimony hardly helps Beausoleil's and Scholl's case against him. Rapelje was not Assistant Deputy Director until September 2017 (ECF No. 61-25, PageID.960), and thus could not have been part of the group that installed cameras at WHV in 2009 or 2010 (ECF No. 61-32, PageID.1280) or part of the group that installed four cameras in the WHV warehouse in 2016 (ECF No. 61-31, PageID.1250). Indeed, Rapelje never visited the WHV warehouse at any time relevant to this case. (ECF No. 61-25, PageID.968.) So Rapelje was not responsible for any blind spots in the warehouse. And Rapelje had little or no familiarity with Moore, Howard, or Laughlin. (ECF No. 61-25, PageID.976.) Beausoleil and Scholl point out that Rapelje talked with Warden Brewer on a weekly basis. (ECF No. 61, PageID.731.) But there is little suggesting that Brewer ever brought Laughlin to Rapelje's attention—at least not at a time when Rapelje could have done anything to protect Beausoleil and Scholl. (*See* ECF No. 61-25, PageID.963, 969–971, 977.) Beausoleil and Scholl also point out that Rapelje "received daily reports of staff rule violations." (ECF No. 61, PageID.731.) True; but Rapelje received these daily emails *after* the claims had been "finally adjudicated." (ECF No. 61-25, PageID.961.) So Rapelje would not have learned about Laughlin until he had been fired. And

if Beausoleil and Scholl are implying that Rapelje knew about Laughlin's knock-and-announce violation, even that is doubtful: that violation was settled on August 1, 2017 (ECF No. 61-17, PageID.857–858), and Rapelje was not the Assistant Deputy Director over WHV until September 2017. In short, there is insufficient evidence that Rapelje knew facts that would have permitted him to draw an inference of a substantial risk of sexual abuse by anyone who worked in the WHV warehouse, let alone that he actually drew that inference. See *Farmer*, 511 U.S. at 837. Nor could a reasonable jury find that Rapelje knowingly acquiesced in any unconstitutional conduct. Rapelje is thus entitled to summary judgment on all of Beausoleil's and Scholl's Eighth Amendment theories.

That finding also holds for Deputy Director McKee and Director Washington. They were not deposed in this case, so there is virtually no evidence of what they knew or what they inferred. True, these high-level MDOC officials were likely involved in setting policy for the MDOC. But the MDOC policies expressly prohibited Laughlin's sexual abuse and required staff to report it. *See* MDOC Policy Directive 03.03.140 (eff. Feb. 8, 2015); MDOC Policy Directive 03.03.140 (eff. Apr. 24, 2017). That Laughlin, Moore, and others may have not followed these policies is not McKee's or Washington's fault. Both are entitled to summary judgment on all of Beausoleil's and Scholl's Eighth Amendment theories.

* * *

To recap the Eighth Amendment analysis, Beausoleil's and Scholl's Eighth Amendment claims against Business Manager Moore and Warden Stewart will survive summary judgment; Scholl's (but not Beausoleil's) Eighth Amendment claims against Warden Brewer will survive

summary judgment; and Beausoleil's and Scholl's Eighth Amendment claims against Curtis, Rivard, Rapelje, McKee, and Washington will be dismissed.

## IV.

In addition to bringing claims under the Eighth Amendment, Beausoleil and Scholl have also sued each defendant under Michigan's Elliott-Larsen Civil Rights Act. ELCRA prohibits disparate treatment "because of . . . sex." Mich. Comp. Laws § 37.2302. And discrimination "because of sex" includes "verbal or physical conduct or communication of a sexual nature" that has the purpose or effect of creating an "intimidating, hostile, or offensive" public-accommodations or public-services environment. *See* Mich. Comp. Laws § 37.2103. Beausoleil and Scholl assert that Business Manager Moore, Warden Stewart, Warden Brewer, and others created a hostile public-accommodations or public-services environment. (ECF No. 30, PageID.306.) Alternatively, they allege that Moore and others were aware that a hostile environment existed at the Women's Huron Valley Correctional Facility but failed to take adequate remedial action. (ECF No. 30, PageID.307.)

Although there are several elements Beausoleil and Scholl must satisfy to prove Moore and others created or permitted a hostile prison environment, Defendants' motion for summary judgment focuses on one: respondeat superior or, in English, "vicarious liability." (ECF No. 57, PageID.507–516.)

Given Defendants' argument, an exploration of Michigan's vicarious-liability standard is in order.

It appears that one way that a plaintiff can establish vicarious liability is by showing that the employee who harassed or assaulted her had previously engaged in similar misconduct. The Michigan Supreme Court's decisions in *Brown v. Brown*, 739 N.W.2d 313 (Mich. 2007), and

40

*Hamed v. Wayne County*, 803 N.W.2d 237 (Mich. 2011), and the Michigan Court of Appeals'
interpretation of *Brown* and *Hamed*, are instructive on what amounts to similar misconduct.

In *Brown*, Lisa Brown provided security for a steel company and Michael Brown (no
relation) worked for the company as a foreman. 739 N.W.2d at 314. On several occasions, Michael
made offensive sexual remarks to Lisa, including "how he loved [Lisa's] long hair and how he
would want to f\*\*\* [her] and pull [her] long hair." *Id.* at 315 & n.3. Michael raped Lisa—a few
months after Lisa had reported Michael's verbal harassment to the company's plant managers. *Id.*
at 315. The Michigan Supreme Court found that the steel company was not vicariously liable: "an
employer can assume that its employees will obey our criminal laws. Therefore, it cannot
reasonably anticipate that an employee's lewd, tasteless comments are an inevitable prelude to
rape if those comments did not clearly and unmistakably threaten particular criminal activity that
would have put a reasonable employer on notice of an imminent risk of harm to a specific victim."
*Id.* at 318.

In *Hamed*, the Michigan Supreme Court, relying in part on *Brown*, addressed a claim that
the Wayne County Sheriff's Department was vicariously liable for quid pro quo sexual harassment
under ELCRA. 803 N.W.2d at 243. There, a deputy sheriff sexually assaulted an arrestee. *Id.* at
242. Prior to the assault, the deputy had some work rule violations and one physical altercation
with a male inmate. *Id.* at 247. The Michigan Supreme Court reasoned, "Because [the deputy's]
prior misconduct was not similar to the violent sexual assault he perpetrated against plaintiff, we
hold that defendants may not be held vicariously liable for quid pro quo sexual harassment based
on Johnson's unforeseeable criminal act." *Id.* In reaching this conclusion, the Michigan Supreme
Court referenced *Brown*: "As we noted in *Brown*, even law enforcement agencies, which are

41

trained in detecting and preventing crime, cannot predict the occurrence of criminal acts." *Id.* at 246.

Following *Brown* and *Hamed*, the Michigan Court of Appeals has required an employee's prior misconduct to be very similar to the misconduct giving rise to the lawsuit before finding the employer vicariously liable. Consider *Smith v. Bronson Lifestyle Improvement & Research Center Company*; although a camp counselor had previously violated work rules by "permitting female campers to jump on him and pull at his clothing," that conduct "was not at all similar to [the counselor's] future commission of criminal sexual contact in a locked closet"; thus, no vicarious liability. No. 321813, 2015 WL 8932816, at *2 (Mich. Ct. App. Dec. 15, 2015). In *Doe 1 v. Young*, a chiropractor was sued for sexually abusing eight patients (some of whom were employees) while providing treatment; although the chiropractor's employer was aware that the chiropractor had "view[ed] images of scantily clad women" on his work computer and had made "unprofessional remarks at work about his sex life and sexual interests," as a matter of law that conduct was not similar enough to his later abuse to establish vicariously liability. *See* No. 335089, 2018 WL 521832, at *1, 6 (Mich. Ct. App. Jan. 23, 2018).

If the *Brown* standard as subsequently interpreted by the Michigan Court of Appeals in *Smith* and *Doe 1*, is the only way for Beausoleil and Scholl to establish vicarious liability, then Warden Stewart and Warden Brewer might have strong claim to summary judgment. As explained, Stewart and Brewer were not privy to the information in the three kites about Laughlin's sexual misconduct. True, a reasonable jury could find that they knew about Laughlin's knock-and-announce violation. But Laughlin's knock-and-announce violation might not convey an "unmistakable propensity" to sexually abuse prisoners and might not be considered an "inevitable prelude" to criminal sexual conduct. *Boman*, 2018 WL 3129703, at *3.

42

Although Defendants rely on *Hamed*, including its language that it is difficult for an employer to "predict the occurrence of criminal acts," Defendants also rely heavily on *Sheridan v. Forest Hills Public Schools*, 637 N.W.2d 536 (Mich. Ct. App. 2001). (*See* ECF No. 57, PageID.510–513.) Defendants suggest that *Sheridan* provides the only two ways that an employee can show that her employer had notice of a hostile environment: the employee's own report (actual knowledge) or pervasive harassment in the workplace (constructive knowledge). (*See* ECF No. 57, PageID.511–513.)

But it appears that there are other ways to establish vicarious liability. In *Chambers v. Trettco, Inc.,* Jennifer Chambers was sexually assaulted by her temporary supervisor over the course of a four-day period. 614 N.W.2d 910, 912 (Mich. 2000). Chambers later sued her employer, asserting both quid-pro-quo and hostile-environment claims under ELCRA. *Id.* at 913. Although the Michigan Supreme Court merely remanded Chambers' hostile-environment claim for further consideration, it provided guidance on the required showing for vicarious liability. "[Chamber's] testimony clearly established the existence of a hostile work environment. The central question to be addressed on remand is whether [she] presented sufficient evidence to demonstrate that [her employer] failed to rectify a problem after adequate notice." *Id.* at 919. The Michigan Supreme Court continued, "notice of sexual harassment is adequate if, by an objective standard, *the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring*." *Id.* (emphasis added). The Michigan Supreme Court repeated these very same words in a later hostile-environment case brought under ELCRA, *Elezovic v. Ford Motor Company*, 697 N.W.2d 851, 861 (Mich. 2005), and the Sixth Circuit has applied this standard in at least one hostile-environment case brought

under ELCRA, *Henderson v. Walled Lake Consolidated Schools*, 469 F.3d 479, 489 (6th Cir. 2006).

It thus appears that there are several ways a plaintiff might prove vicarious liability under ELCRA. *See Hamed*, 803 N.W.2d at 244 (providing that ELCRA "specifically incorporates common-law agency principles" and that "traditional principles of respondeat superior" apply). A plaintiff might show, for instance, that an employer knew or should have known that an employee was engaging in sexual harassment or abuse by showing that the employee engaged in prior, similar misconduct. *See Brown*, 739 N.W.2d 318; *Hamed*, 803 N.W.2d at 245. Or a plaintiff might show, for instance, that her employer knew of sexual harassment or abuse because she reported it to the employer. *See Sheridan*, 637 N.W.2d at 542. Or a plaintiff might show that the sexual harassment or abuse was so pervasive in the workplace that any reasonable employer could not help but notice it. *See id.* There may still be other ways of showing the employer knew of a sexually hostile environment. Thus, it makes sense that *Chambers* provides a general standard: "notice of sexual harassment is adequate if, by an objective standard, *the totality of the circumstances* were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Id.* at 919 (emphasis added). Indeed, *Sheridan*, upon which Defendants heavily rely, quoted this very language from *Chambers*. *Sheridan*, 637 N.W.2d at 542 (quoting *Chambers*, 614 N.W.2d at 919).

In any event, Defendants have not shown that the *Chambers* standard does not apply to an ELCRA hostile-environment claim. And, in fact, it has been applied in another ELCRA case against the MDOC. *See Woods v. Dep't of Corr.*, No. 333825, 2018 WL 1611444, at *4 (Mich. Ct. App. Apr. 3, 2018) (applying standard from *Chambers* and finding "a question of fact existed with

respect to whether defendant would have been aware of a substantial probability that sexual harassment was occurring").

With *Chambers* as a presumptively available route for Beausoleil and Scholl to take, the vicarious-liability analysis is straightforward. The Court has already concluded that a reasonable jury could find that Business Manager Moore, Warden Stewart, and Warden Brewer each inferred a substantial risk that Laughlin was sexually abusing female prisoners. Yet the vicarious-liability standard articulated in *Chambers* is even easier for Beausoleil and Scholl to satisfy: it need not be the case that Moore, Stewart, and Brewer personally inferred a substantial risk that Laughlin was sexually abusing female prisoners, instead it need only be that "a reasonable employer" in their position "would have been aware of a substantial probability that sexual harassment was occurring," *Chambers*, 614 N.W.2d at 919. In other words, because a reasonable jury could find Moore, Stewart, and Brewer violated the Eighth Amendment, *a fortiori* a reasonable jury could find Moore, Stewart, and Brewer are vicariously liable for Laughlin's abuse under ELCRA. (But, as with Beausoleil's Eighth Amendment claim against Brewer, her ELCRA claim against Brewer fails due to timing.)

In the alternative, Defendants argue that even if they had notice of a sexually hostile environment, they took "prompt and appropriate remedial action." (ECF No. 57, PageID.513); *see also Radtke v. Everett*, 501 N.W.2d 155, 168 (Mich. 1993) ("Under the Michigan Civil Rights Act, an employer may avoid liability if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment."). In support of their argument, Defendants point to their two internal investigations upon receiving Beausoleil's EEOC charge. (*See* ECF No. 57, PageID.514–515.) But that was hardly prompt: by then, Laughlin had completed his abuse of Beausoleil and Scholl and had long since been suspended from WHV.

That leaves Beausoleil's and Scholl's ELCRA claims against the MDOC higher-ups who did not work at WHV. The Court will be brief. For reasons stated in addressing Beausoleil's and Scholl's Eighth Amendment claims against Assistant Deputy Director Curtis, Rivard, and Rapelje, Deputy Director McKee, and Director Washington, these defendants were not aware of facts from which they could have reasonably inferred a substantial probability that Laughlin was sexually abusing female prisoners. They are thus entitled to summary judgment on Beausoleil's and Scholl's ELCRA claims.

## V.

For the reasons given, the Court enters the following order. Beausoleil and Scholl's motion for excess pages (ECF No. 60) is GRANTED. Defendants' motion for summary judgment (ECF No. 57) is GRANTED IN PART and DENIED IN PART. In particular, Bruce Curtis, Steve Rivard, Lloyd Rapelje, Kenneth McKee, and Heidi Washington are GRANTED summary judgment on all of Beausoleil's and Scholl's claims against them and those defendants are DISMISSED. Shawn Brewer is GRANTED summary judgment on all of Beausoleil's claims against him, but all of Scholl's claims against Brewer remain in this case. Count IV is DISMISSED because Beausoleil and Scholl have withdrawn it (ECF No. 61, PageID.740), and former Governor Rick Snyder is DISMISSED because Beausoleil and Scholl have agreed to dismiss him (ECF No. 61, PageID.695). All remaining claims of the third amended complaint (ECF No. 30) will proceed to trial. The remaining defendants in this case are Norman Laughlin, Toni Moore, Anthony Stewart, and Shawn Brewer.

SO ORDERED.

Dated: February 17, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE